**SHAPIRO, CROLAND, REISER,**
  **APFEL & DI IORIO, LLP**
**Attorneys at Law**
David O. Marcus, Esq. (Attorney I.D. No.: 025991985)
Continental Plaza II
411 Hackensack Avenue
Hackensack, New Jersey 07601
(201) 488-3900
(201) 488-9481 (Fax)
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DOUGLAS STEPHEN PLASTICS, INC., a New Jersey Corporation, DPS SALES, INC. a New Jersey Corporation and DOUGLAS GRAFF, | Case No.: |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| EASYPAK DSP, LLC, a Delaware Limited Liability Company, and EASYPAK HOLDINGS, LLC, a Delaware Limited Liability Company | |
| Defendants. | |

Plaintiffs, Douglas Stephen Plastics, Inc., DPS Sales, Inc. and Douglas Graff, by way of Complaint against the Defendants, EasyPak DSP, LLC, and Easypak Holdings, LLC, says as follows:

## THE PARTIES

1.      Plaintiffs DPS Sales, Inc. ("DPS") and Douglas Stephen Plastics, Inc. ("Douglas Stephen") are New Jersey corporations with offices located at 299 Werimus Road, Woodcliff Lake, NJ 07677.

2.      Plaintiff Douglas Graff is a resident of the State of New Jersey who resides at 299 Werimus Road, Woodcliff Lake, NJ 07677.

3.      Defendant EasyPak DSP, LLC ("EasyPak") is a Delaware limited liability company with offices located at 24 Jytek Drive, Leominster, MA 01453.

4.      Defendant Easypak Holdings ("Holdings") is a Delaware limited liability company, is an affiliate of Easypak and upon information and belief, the parent of Easypak. Holdings also maintains offices at 24 Jytek Drive, Leominster, MA 01453.

## JURISDICTIONAL ALLEGATIONS

5.      This Court has subject matter jurisdiction over the within matter pursuant to 28 U.S.C. §1332 as (a) Plaintiffs and Defendants are citizens of different states; and (b) the amount in controversy exceeds $75,000.

6.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2).  In that regard, not only did the events giving rise to this claim take place in New Jersey, but the contractual agreement of the parties that is the subject matter of this action specifically provides, in relevant part, that all actions arising out of the agreement shall be venued in the United States District Court for the District of New Jersey.

## ALLEGATIONS COMMON TO ALL COUNTS

7.     On March 4, 2020, an Asset Purchase Agreement was entered into by and among Defendant Easypak, Douglas Stephen, DPS, Graff Stock Trust, Miriam Graff, Douglas Graff and Marla Kaufman (the "APA").

8.     Pursuant to the provisions of Section 5.12 of the APA Defendant Holdings agreed to cause Easypak to perform all of its obligations under the APA and all of the "Ancillary Agreements" (as defined in the APA) (hereinafter the "Guarantee").

9.     Pursuant to the provisions of Section 4.6, Easypak represented and warranted that it had the financial ability to fully satisfy its obligations under the APA and the Ancillary Agreements.

10.     Pursuant to the provisions of Section 7.1(a)(i) the representation and warranty of Easypak's ability to pay the full consideration due to Plaintiff under Section 4.6 survived the consummation of the APA indefinitely.  The failure of Easypak to make payment under the APA and the Ancillary Agreements when due constitutes a breach of the APA since it evidences that Easypak did not in fact have the ability to pay.

11.     Under the APA, EasyPak acquired substantially all of the assets of Douglas Stephen (sometimes referred to as "Seller") for the purpose of continuing the business of Douglas Stephen.  The parties contemplated that the business would continue to operate for a period of time at Douglas Stephen's facility in Paterson, New Jersey until such time as EasyPak consolidated the operations with its existing business at another location (the period from the date of the closing of the APA to the date Easypak consolidated the operations in Paterson, New Jersey with its operations at another location hereinafter the "Transition Period").

12.     As part of the APA, the parties simultaneously entered into a Transition Services Agreement (the "TSA") under which Plaintiffs Douglas Stephen and DPS (the "Service Providers") agreed to provide certain services to EasyPak during the Transition Period in order to facilitate the orderly transition of the business and to memorialize certain ongoing business relationships (defined in the TSA as the "Services") for which EasyPak agreed to pay a fee (the "Service Fees"), which services included the maintaining of employees under the name of Douglas Stephen and having Douglas Stephen pay their salary even though they were providing services to Easypak.  A true copy of the TSA is annexed as Exhibit "A".

13.     The TSA is one of the Ancillary Agreements as defined in the APA the performance of which was guaranteed by Holdings under the Guarantee.

14.     Schedule "A" to the TSA is a schedule listing the Services that the agreement contemplated would be provided and the Service Fees or Compensation due for the provision of the Services.  The Services included Employment Related Services, including but not limited to paying payroll and payroll taxes, and Insurance Related Services as described therein.  In essence, the Seller under the APA continued to expend the funds necessary to pay the employees to operate the business as well as the insurance covering the business operations during the Transition Period and such amounts expended by the Seller were to be reimbursed by the Easypak.

15.     The amounts due under the TSA were to be paid for within specific time frames stated in the Agreement.

16.     Plaintiffs provided the Services as required under the TSA  as requested in accordance with its terms and billed Easypak for those services on a timely basis during the term of the Agreement.

17.     Plaintiffs issued invoices to the Easypak requesting reimbursement for the Services that it provided.

18.     Defendant Easypak failed to pay the invoices on a timely basis and the Plaintiffs granted Easypak's request for extensions of the time to make payment on more than one occasion based upon the continued promises of Easypak and Holdings to make the remaining payments.

19.     Notwithstanding the forgoing, the last payment that was due on or about March of 2021 to reimburse Douglas Stephen under the TSA in an amount of over One Million Dollars ($1,000,000) was not made by Easypak, and Douglas Stephen agreed to allow Easypak to pay said amount if four (4) equal installments, the last being due on or about November 30, 2021.  Easypak paid three (3) installments and failed to pay the last installment due in November of 2021 in the amount of $252,401.89.

20.     At the request of Easypak, Plaintiffs agreed to further revise the terms of payment of the final installment to permit the final installment of $252,401.89 to be paid in three equal installments on February 25, 2022, March 25, 2022 and April 15, 2022.

21.     Easypak made the first two payments to Plaintiffs but has failed to pay the third installment due on April 15, 2022, advising that it would violate its minimum liquidity covenant to its lender if the payment was made.

## FIRST COUNT

22.     The failure of EasyPak to pay the amount due is a breach of the TSA  and the APA.

23.     Pursuant to Section 5.2 of the TSA , EasyPak and Holdings (by virtue of section 5.12 of the APA cited above), are obligated to indemnify the Plaintiffs for all Losses incurred by the Plaintiffs that arise out, relate to or result from any breach by the Defendants of the APA .  The term Losses means, in relevant part, all damages, interest, penalties, costs and expenses of any kind or nature, including, without limitation, interest, penalties, legal, accounting, other professional fees and expenses or other costs and expenses incurred by the Plaintiff in the prosecution of any action.

24.     As a result of the breach of the TSA by EasyPak, Plaintiffs are entitled to recover from the Defendants damages, including the $84,133.96 that is owed for Services rendered under the TSA together with interest, attorneys' fees and costs of suit.

WHEREFORE, Plaintiffs Douglas Stephen Plastics, Inc. and DPS Sales, Inc. demand judgment against Defendant EasyPak DSP, LLC and Easypak Holdings, LLC for $84,133.96 , together interest, reasonable attorneys' fees and costs of suit and such other and further relief as the Court deems just and proper.

## SECOND COUNT

25.     Plaintiffs incorporate herein by reference all of the allegations contained in paragraphs 1 through 24 above.

26.     As a result of the breach by Defendants of the TSA  and of the representation made in Section 4.6 of the APA that the Easypak  has the financial capability to fully satisfy all of its obligations under the APA and the Ancillary

Agreements Plaintiffs and their agents, representatives, officers and employees, including but not limited to Douglas Graff, are relieved of any and all continuing obligations under the APA and all Ancillary Agreements including, but not limited to the Confidentiality provisions of Section 5.3 of the APA, and the Non-Compete and Non-Solicit provisions of Section 5.4 of the APA.

WHEREFORE, Plaintiffs demand judgment on the Second Count of the Complaint as follows:

A.      Declaring that the breach by the Defendants of their obligations under the Transition Services Agreement, and the breach of their representations and warranties under the APA are material breaches of the APA that relieve the Plaintiffs, Douglas Graff and all other officers, agents and representatives of the Plaintiffs from any and all obligations under Sections 5.3 and 5.4 of the Agreement and any Ancillary Agreements executed by them in connection with the APA.

B.      For an award of attorneys' fees and costs incurred by the Plaintiffs to enforce the terms of the Transition Services Agreement and the APA, including the fees and costs incurred to prosecute this action; and

C.      For such other and further relief as the Court deems just and proper.

SHAPIRO, CROLAND, REISER,
APFEL & DI IORIO, LLP
Attorneys for Plaintiffs

By: _____
       David O. Marcus

Dated:   April 19, 2022

# EXHIBIT A

# TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement") is dated as of March 4, 2020, among EasyPak DSP, LLC, a Delaware limited liability company ("Buyer"), Douglas Stephen Plastics, Inc., a New Jersey corporation ("Seller") and DPS Sales, Inc., a New Jersey corporation ("DPS Sales").

**Recitals:**

A.     Pursuant to that certain Asset Purchase Agreement, dated as of the date hereof, by and among Buyer, Seller, DPS Sales, Graff Stock Trust, Miriam Graff, Douglas Graff and Marla Kaufman (the "Purchase Agreement"), Buyer acquired substantially all of the assets of Seller.

B.     To facilitate an orderly transition of Seller's business (the "Business") to Buyer following the Closing, and to memorialize certain ongoing business relationships, Buyer, Seller and DPS Sales wish to set forth their agreements with respect to the provision of certain services by Seller and DPS Sales to Buyer following the Closing.

C.     All capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer, Seller and DPS Sales hereby agree as follows:

## ARTICLE I
## SERVICES PROVIDED

**1.1.     Services.**     Upon the terms and subject to the conditions set forth in this Agreement, Seller and DPS Sales (together, the "Service Providers") shall provide the applicable services set forth on Schedule A hereto (individually, a "Service" and collectively, the "Services") to Buyer and its affiliates (the "Service Recipient") during the time period specified on Schedule A for each such Service (individually, a "Time Period" for a Service and collectively, the "Time Periods" for all of the Services), as particular services are requested by the Service Recipient in its sole discretion.

**1.2.     Performance Standard.**     The Service Provider shall provide the applicable Services with the same degree of care, skill and diligence and in substantially the same manner as the corresponding Services were performed as of the date hereof and in any event, in a professional and competent manner. The Service Provider shall perform all applicable Services in accordance with all applicable Laws.

**1.3.     Additional Services.**     In the event Buyer requests that the Services be modified or expanded, the parties may approve by written amendment to Schedule A such modifications or other changes as are agreed by Buyer and Seller; provided, however, that if Buyer requests that the Service Providers expand any existing Service or provide additional Services that may be necessary to provide for an orderly transition of the operation of the Business or that have been historically provided by any Service Provider or its Related Persons to the Business, Seller's consent to such request shall not be unreasonably withheld, conditioned or delayed. If Buyer and Seller agree to expand or modify the Services, the parties shall work together in good faith to

determine the fees applicable to any additional Services and any changes to the then-existing fees as a result of any expansion or modification to the Services; provided, however, that in no event shall the fees for such additional services be less than that set forth on Schedule A for offices services.

**1.4.    Service Coordinators**.   The Service Providers designate Douglas Graff as its administrative contact for purposes of this Agreement, and Buyer designates Joan Rainsford as its administrative contact for purposes of this Agreement (each, a "Service Coordinator"). Each party may change its Service Coordinator upon advance written notice to the other party. The contact information for each Service Coordinator is set forth on Schedule B. The Service Coordinators shall participate in review meetings with each other by telephone or in person, as needed and as mutually agreed upon, to discuss (a) issues relating to the provision of the Services and/or the payments due therefor, (b) any problems identified with the provision of Services and/or the payments due therefor and (c) to the extent Service expansions or modifications are agreed upon, the implementation of such changes and fees to be charged therefor.

## ARTICLE II
## CONFIDENTIALITY AND INTELLECTUAL PROPERTY

**2.1.    Obligation.**  Except if compelled by a court or as required by applicable Law, the Service Providers shall not use or permit the use of (without the prior written consent of the other party) and shall keep, and shall cause its Related Persons, consultants and advisors to keep, confidential, all information (other than information that is in the public domain, is independently developed or is rightly received from a third party who is not subject to a confidentiality obligation with respect to the disclosed information) concerning Buyer and its Related Persons received in connection with this Agreement or that becomes known to it by virtue of its provision of the Services.

**2.2.    Intellectual Property.**  Except as set forth in Schedule A, the parties acknowledge and agree that nothing in this Agreement is intended to transfer any right, title, or interest in and to any tangible, intangible, real or personal property (including any and all intellectual property rights) owned by either party.

**2.3.    Standard of Care.**  With respect to any confidential information of a party hereto, the other party shall use the same degree of care in safeguarding such information as it uses to safeguard its own confidential information, but no less than a reasonable standard of care.

**2.4.    Books and Records.**  The Service Providers shall provide Buyer with copies of books and records concerning Buyer and its business and operations generated by any Service Provider in providing Services if requested by Buyer. Buyer shall reimburse the Service Providers for any reasonable out-of-pocket costs incurred in providing such copies at Buyer's request.

## ARTICLE III
## COMPENSATION

2

**3.1.**   **Compensation**.  As consideration for the Services provided hereunder, Buyer shall pay the applicable Service Provider the fee, if any, for each Service performed in each case as set forth opposite such Service on Schedule A hereto (including any reimbursement of costs and expenses specified thereon) (the "Service Fees").   Additionally, Buyer shall be solely responsible to reimburse the applicable Service Provider for the Retention Bonuses described on Schedule A.

**3.2.**   **Invoices**.

(a)    Except with respect to the applicable Service Provider's payment of wages and Retention Bonuses, employer-related payroll taxes incurred with respect to said wages and Retention Bonuses and direct employee benefit costs to the Business Employees as contemplated by Schedule A (as described in Schedule A, said amounts hereinafter the "Employee Costs"), after the end of each month, the Service Providers shall submit an invoice to Buyer for all Service Fees incurred and costs and expenses subject to reimbursement pursuant to Schedule A (other than Employee Costs), in each case in connection with the Services provided during such month in accordance with Schedule A hereto and together with reasonable supporting documentation therefor. Except as otherwise provided in Section 3.2(b), payment of all invoices in respect of a Service shall be made by check or electronic funds transmission in U.S. Dollars, within fourteen (14) days of the invoice.

(b)    With respect to Employee Costs, the Service Providers shall submit a proposed calculation of the amounts to be paid to the Business Employees at least three (3) business days prior to payment together with reasonable supporting documentation.  Prior to paying such Employee Costs, the Service Providers shall take into account Buyer's comments provided during such three (3) business day period with respect to such calculations and provide Buyer a final calculation of the Employee Costs to be paid.   The Service Providers shall promptly provide Buyer proof of payment and Buyer will reimburse the applicable Service Provider (without duplication) for such Employee Costs by check or electronic funds transmission in U.S. Dollars within seven (7) business days after delivery of such proof of payment.

(c)    All payments by wire transfer shall be made to an account designated by Seller in a written notice provided to Buyer from time to time.  In the event of a termination of a Service, whether before or at the expiration of the applicable Time Period in accordance with Section 4.2, the Buyer shall be obligated to pay the fees and provide reimbursement for the costs and expenses for such Service that are specified for such Service on Schedule A hereto through such termination date, payable in accordance with the terms and conditions hereof.  For the avoidance of doubt, no expiration or earlier termination of a Service shall affect the Buyer's obligations with respect to payment for such Service through the date of expiration or termination in the amounts set forth on Schedule A hereto, subject to the terms and conditions of this Agreement including, without limitation, Section 3.1 and this Section 3.2.

**3.3.**   **Disputes**.  Should Buyer dispute in good faith any portion or all of the amount due on any invoice or request any adjustment to an invoiced amount, the Service Coordinator of Buyer shall notify the Service Coordinator of the Service Providers in writing as soon as

3

reasonably practicable of the specific nature and basis of the dispute or adjustment, and the Service Coordinators shall work in good faith to resolve such dispute in a timely manner. Nothing contained herein shall relieve the Buyer from making payment for the undisputed portion of the Services provided to the Service Recipient. The Service Providers shall continue performing the Services in accordance with this Agreement pending resolution of any dispute.

**3.4.** **Breach**. Should the Buyer breach its obligations to any pay for any one or more of the Services provided hereunder, and should that breach continue for ten (10) business after Seller delivers Buyer written notice of such breach, then in such event, said breach, even it relates only to one Service, shall be a breach of this entire Agreement and shall entitle the Service Providers to immediately terminate this Agreement and provide final invoices for the Service provided to the date of such termination, which invoices shall be paid within fourteen (14) business days of the date of the submission of said invoices. For the avoidance of doubt, a good faith dispute regarding the amount of any Service Fees or other amounts payable hereunder shall not be deemed a breach of this Agreement.

## ARTICLE IV
## TERM

**4.1.** **Term**. This Agreement shall become effective on the Closing Date and shall remain in force until the earlier of (a) the expiration of the latest Time Period referred to in Schedule A hereto, or (b) the termination of all Services in accordance with Section 4.2. The Service Providers shall not be obligated to provide a Service following the earlier of (x) expiration of the Time Period for such Service and (y) the effective date of termination for such Service in accordance with Section 4.2.

**4.2.** **Termination of Services**. Buyer may, at its option and in its sole discretion, terminate any Service that any Service Recipient is entitled to receive hereunder and its related Time Period prior to the expiration of such Time Period by delivering written notice to Seller (a "Service Termination Notice") not less than 10 days (or as specified in Schedule A hereto) before the effective date of termination of such Service specified in such Service Termination Notice. The termination or expiration of any Service shall not affect the parties' obligations with respect to other Services.

**4.3.** **Survival of Certain Rights and Obligations**. The following rights and obligations shall survive the termination of this Agreement: (a) the rights and obligations of each party under Articles II through VI; and (b) the Service Providers' right to receive the compensation for the Services provided by the Service Provider hereunder in accordance with Article III.

## ARTICLE V
## INDEMNIFICATION

**5.1.** **Seller Indemnity**. Subject to the limitations set forth herein, Seller shall indemnify and keep each Buyer Indemnitee harmless from and against all Losses incurred by such Buyer Indemnitee to the extent such Losses arise out of, relate to or result from (a) the gross negligence, willful misconduct or fraud of any Service Provider or any of its Related Persons or

4

Representatives in connection with the subject matter of this Agreement or (b) any breach by any Service Provider or any of its Related Persons or Representatives of this Agreement; provided that Seller shall not be obligated to indemnify any Buyer Indemnitee under this Section 5.1 to the extent (i) that such Losses result from Buyer's breach of this Agreement or the gross negligence or willful misconduct of such Buyer Indemnitee or (ii) a Buyer Indemnitee is or would be required to indemnify Seller for such Losses under the Purchase Agreement (without regard to any limitation set forth in the Purchase Agreement, whether a temporal limitation, a dollar limitation or otherwise).

5.2.   **Buyer Indemnity**.   Subject to the limitations set forth herein, Buyer shall indemnify and keep each Seller Indemnitee harmless from and against all Losses incurred by such Seller Indemnitee to the extent such Losses arise out of, relate to or result from (a) the gross negligence, willful misconduct or fraud by Buyer or any of its Related Persons or Representatives in connection with the subject matter of this Agreement, (b) any breach by Buyer or any of its Related Persons or Representatives of this Agreement or (c) any claims against any Service Provider by any Business Employee to the extent arising from such Service Provider's provision of such Business Employee's services to Buyer hereunder for use in Buyer's operations (and excluding any claims arising from any Service Provider's breach of any obligation owing to such Business Employee); provided that Buyer shall not be obligated to indemnify any Seller Indemnitee under this Section 5.2 to the extent (i) that such Losses result from any Service Provider's breach of this Agreement or the gross negligence or willful misconduct of such Seller Indemnitee or (ii) a Seller Indemnitee is or would be required to indemnify Buyer for such Losses under the Purchase Agreement (without regard to any limitation set forth in the Purchase Agreement, whether a temporal limitation, a dollar limitation or otherwise).

5.3.   **Third-Party Claims**.   Any third-party claims for which indemnification shall be sought hereunder shall be subject, *mutatis mutandis*, to the third-party claim procedures set forth in Section 5.5 of the Purchase Agreement.

5.4.   **Insurance**.   All of the insurance policies maintained in accordance with Schedule A shall name Buyer as an additional insured and provide waiver of subrogation to Buyer where permitted by law and the insurance company issuing such policy and shall also provide Buyer with 30 days' notice of cancellation or non-renewal.  The amount of any Losses under this Article V shall be computed net of any insurance proceeds actually received by an indemnitee in connection with or as a result of any claim giving rise to such Losses; provided that the amount of such proceeds shall be net of any (a) deductibles for the applicable insurance policies, and (b) any other reasonable and documented out-of-pocket costs incurred in connection with collecting such proceeds.

5.5.   **Mitigation**.   Each party hereto shall (and shall cause its related indemnitees, as applicable, to) use commercially reasonable efforts to mitigate any Losses that are indemnifiable hereunder.

**ARTICLE VI**
**MISCELLANEOUS**

5

**6.1.    General Cooperation.**  Buyer, Seller and DPS Sales shall cooperate in good faith to enable the provision of Services in accordance with this Agreement.

**6.2.    Force Majeure.**  Any failure or omission by any Service Provider in the performance of any obligation under this Agreement shall not be deemed a breach of this Agreement if the same arises or results from acts of God, fire, storm, flood, earthquake, governmental regulation or direction, acts of the public enemy, war, terrorism, rebellion, insurrection, riot, invasion or failure of public utilities or common carriers, in each case which is beyond the reasonable control of the Service Providers; provided, however, that the Service Providers shall promptly give Buyer written notice thereof and take commercially reasonable measures to remove or otherwise address the impediment to action.

**6.3.    No Partnership and Independent Contractor Relationship.**  Nothing contained herein shall, by virtue of this Agreement, create a partnership, joint venture, agency or employment relationship among the parties hereto.  No agent or employee of any party hereto shall be the agent or employee of the other party by virtue of this Agreement.  The relationship of the parties hereunder is that of independent contractors and nothing contained herein shall be deemed to create a joint venture, partnership or any other relationship. No party hereto shall have any power or authority to negotiate or conclude any agreement, or to make any representation or to give any understanding on behalf of the other in any way whatsoever.  All employees and representatives of each party shall be deemed for purposes of all compensation and employee benefits to be employees or representatives of such party and not employees or representatives of any other party or any of its Affiliates.  Except as provided on Schedule A, each party shall be responsible for and shall withhold or pay, or both, as may be required by Law, all Taxes pertaining to the employment of such party's personnel and/or performance by such party of the Services rendered hereunder.  Except as provided on Schedule A, each party also assumes responsibility for the payment of all payroll burdens, fringe benefits and payroll Taxes, whether federal, state, municipal or otherwise, as to such party's employees, servants or agents engaged in the performance of the Services.

**6.4.    Severability.**  Except as otherwise expressly provided herein, any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. If any court determines that any covenant or any part of any covenant is invalid or unenforceable, all other covenants shall not thereby be affected and shall be given full effect, without regard to the invalid portions.

**6.5.    Notices.**  Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered in accordance with Section 8.7 of the Purchase Agreement.

**6.6.    Waivers and Amendments; Non-Contractual Remedies; Preservation of Remedies.**  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by the parties

6

hereto or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege, nor any single or partial exercise of any right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege. The rights and remedies provided in this Agreement are exclusive of any rights or remedies that any party may otherwise have at law or in equity.

**6.7.** **Governing Law**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey, without reference to the conflicts of laws rules or provisions thereof.

**6.8.** **WAIVER OF TRIAL BY JURY**. EACH OF THE PARTIES HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY LAWSUIT, ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.

**6.9.** **Consent to Jurisdiction**. This Agreement has been executed and delivered in and shall be deemed to have been made in New Jersey. Each of the parties (a) agrees to the exclusive jurisdiction of the United States District Court for the State of New Jersey or, if the United States District Court for the State of New Jersey cannot hear a claim or cause of action arising under or relating to this Agreement, then the state courts of the State of New Jersey, and (b) waives personal service of any and all process upon it, and consents that all services of process be made by registered or certified mail, return receipt requested, directed to it at its address as set forth in Section 6.5, and service so made shall be deemed to be completed when received. The parties each waive any objection based on, and agree not to assert, (i) forum non conveniens, (ii) lack of personal jurisdiction of the above-named courts, (iii) lack of subject matter jurisdiction of the above-named courts, and (iv) improper venue. Nothing in this paragraph shall affect the right of the parties to serve legal process in any other manner permitted by law.

**6.10.** **Binding Effect; Beneficiaries of Agreement**. Subject to compliance with the restrictions in Section 6.11, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. The covenants, agreements and promises of the parties expressed in this Agreement are for the sole benefit of the parties hereto and are not intended to benefit, and may not be relied upon or enforced by, any other Person, except for (a) a Related Person of Buyer for whom Services are required to be performed as set forth on Schedule A, which Related Person shall be a beneficiary hereunder, notwithstanding the fact that such Related Person is not a party hereto, and (b) the Persons identified in Article V, each of which shall be a beneficiary thereof, notwithstanding the fact that such Person is not a party hereto.

7

**6.11.   Assignability**.  This Agreement shall not be assignable by Seller or DPS Sales without the prior written consent of Buyer, or by Buyer without the prior written consent of Seller, except that Buyer may assign this Agreement (a) to the purchaser of all or substantially all of its equity or assets, whether by means of a sale of equity, assets or merger or (b) in a collateral assignment, to its financing sources, without the prior written consent of the other; provided, however, that solely with respect to clause (a), the purchaser shall assume the obligations of the Buyer hereunder.  No such assignment shall relieve the assignor of its obligations under this Agreement.  Any attempted assignment in violation of the terms and conditions hereof shall be null and void.

**6.12.   Counterparts**.  This Agreement may be executed by the parties hereto in separate counterparts and by facsimile or digital (.PDF) signature, each of which when so executed and delivered shall be an original, but both of which together shall constitute one and the same instrument.

**6.13.   Interpretation**.  In the event that any one or more provisions of this Agreement shall be determined by a court or other judicial or administrative body to be illegal or unenforceable, such illegality or unenforceability shall not affect the validity or enforceability of the remaining legal and enforceable provisions hereof, which shall be construed as if such illegal or unenforceable provision or provisions had not been inserted herein.

**6.14.   Entire Agreement**.  This Agreement (including the schedules hereto) contains the entire agreement among the parties with respect to the provision of the Services, and supersedes all prior agreements, written or oral, with respect thereto.

**6.15.   Remedies.**  The parties hereto acknowledge and agree that irreparable harm for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any party does not fully and timely perform its obligations under or in connection with this Agreement in accordance with the terms of this Agreement.  The parties acknowledge and agree that (a) the other party shall be entitled to seek an injunction, specific performance, or other equitable relief, to prevent breaches of this Agreement and to seek to enforce specifically the terms and provisions hereof, without proof of damages, this being in addition to any other remedy to which such other parties are entitled under this Agreement, and (b) the right to obtain an injunction, specific performance, or other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither party would have entered into this Agreement. Each party agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the other parties have an adequate remedy at law.

*[Signature page follows]*

8

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date first above written.

EASYPAK DSP, LLC

By: _____
Name: Dennis Dunegan
Title: Vice President


DOUGLAS STEPHEN PLASTICS, INC.


By: _____
Name: Douglas Graff
Title: President

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date first above written.

EASYPAK DSP, LLC

By: _____
Name: Dennis Dunegan
Title: Vice President

DOUGLAS STEPHEN PLASTICS, INC.

By: _____
Name: Douglas Graff
Title: President

*[Signature Page to Transition Services Agreement]*

DPS SALES, INC.

By: _____

Name: Douglas Graff

Title:  Manager

## SCHEDULE A

### SERVICES

The Services to be provided by Seller and DPS Sales shall consist of:

| Service Provided | Time Period[1] | Service Fee Amount |
|---|---|---|
| **Employment-Related Services** | | |
| Each of Seller and DPS Sales shall use commercially reasonable efforts to cause the employees of Seller and DPS Sales that perform services in connection with the operation of the Business as of the Closing (the "Business Employees") (a) to remain employees of Seller or DPS Sales, as applicable, and (b) as requested by Buyer or the applicable Service Recipient, to provide services to Buyer or a Service Recipient with respect to the operation of the Business, which services are to be similar to the services such Business Employee was providing to Seller or DPS Sales, as applicable, or other similar services reasonably requested by Buyer.  Each of Seller and DPS Sales shall, at Buyer's direction and sole cost and expense, use commercially reasonable efforts to hire additional employees to the extent necessary to perform the Services.  For the avoidance of doubt, such additional employees shall not be entitled to a Retention Bonus.<br><br>Buyer shall provide the Business Employees with work opportunities consistent in all material respects with past | From the Closing Date until the date on which the Amended and Restated Lease Agreement expires or is terminated (the "Transition Period") | Subject to the procedures set forth in Article III, Buyer will reimburse Seller and DPS Sales, as applicable, for the salary and wages ("Wages"), all employer-related payroll taxes incurred in connection with the payment of Wages, and direct employee benefit costs in respect of the benefit plans set forth on Schedule 3.16(a) to the Purchase Agreement (but in no event including vehicle allowances), in each case incurred by Seller or DPS Sales, as applicable, for the engagement and employment of the Business Employees during the Transition Period with respect to services provided to Buyer, in each case solely to the extent such |

---

[1] The "Time Period" sets forth the period of time (which may be reduced by Buyer), during which Buyer has the right, in its sole discretion, but not the obligation, to require that Seller provide the applicable Services.

26148145.10.BUSINESS

| Service Provided | Time Period[1] | Service Fee Amount |
|---|---|---|
| practice, including the number of hours per week and wage rate. However, Buyer may alter the role and character of the work to be performed by any Business Employee; provided, however, that neither Seller nor DPS Sales shall have any liability if a Business Employee refuses to accept such alteration or if said Business Employee terminates his/her employment with the Seller or DPS Sales as a result of such alteration. | | amounts are consistent with the Wages and benefit costs paid to such employees prior to Closing. Neither Seller nor DPS Sales shall increase such amounts without Buyer's prior written consent. Reimbursement of travel and entertainment expenses for Business Employees shall be subject to Buyer's prior written approval. |
| The Business Employees shall be entitled to the following bonuses (each, a "Retention Bonus"): | | |
| a. for any Business Employee (x) that remains an employee of Seller or DPS Sales, as applicable, and provides services to Buyer from the date hereof through the date that is three (3) months following the date of this Agreement and (y) whose employment is terminated at the request of Buyer prior to the date that is six (6) months following the date of this Agreement, a bonus equal to the product of (i) one (1) and (ii) the monthly average of such Business Employee's Wages for the three (3) month period ending on the date of termination; or | | Buyer shall reimburse Seller and DPS Sales, as applicable, for payment of Retention Bonuses and all employer-related payroll taxes incurred in connection with the payment of the Retention Bonuses to any Business Employee in accordance with the procedures set forth in Article III. |
| b. for any Business Employee (x) that remains an employee of Seller or DPS Sales, as applicable, and provides services to Buyer from the date hereof through the date that is six (6) months following the date of this Agreement and (y) whose employment is terminated at the request of Buyer prior to the date that is nine (9) months following the date of this Agreement, a bonus equal to the product of (i) one and a half (1.5) and (ii) the monthly average of such Business Employee's Wages for the six (6) month period | | Additionally, Buyer will pay Seller or DPS Sales, as applicable, within fourteen (14) days after (a) the date that is six (6) months following the date hereof and (b) the expiration of the Transition Period, a fee equal to 10% of the aggregate amount of Wages paid to the Business |

A-2

26148145.10.BUSINESS

| Service Provided | Time Period[1] | Service Fee Amount |
|---|---|---|
| ending on the date of termination; or<br><br>c. for any Business Employee that remains an employee of Seller or DPS Sales, as applicable, and provides services to Buyer from the date hereof through the date that is nine (9) months following the date of this Agreement, a bonus equal to the product of (i) two (2) and (ii) the monthly average of such Business Employee's Wages for the nine (9) month period ending on the date of termination.<br><br>With respect to any Business Employee, payment of the Retention Bonus is conditioned upon such Business Employee continuing to be employed by Seller or DPS Sales, as applicable, and to provide services to Buyer through the relevant date and shall be irrevocably forfeited in the event such Business Employee (x) ceases to provide such services prior to the relevant date, (y) terminates his or her employment or (z) is terminated (or Buyer requests to be terminated) for cause. For the avoidance of doubt, a Business Employee shall only be entitled to a single Retention Bonus. | | Employees in connection with the services hereunder (i) with respect to the payment contemplated by clause (a), during such six (6) month period or (ii) with respect to the payment contemplated by clause (b), the period from the date that is six (6) months following the date hereof and the expiration of the Transition Period, as applicable (the "Employment Fees"). The Retention Bonuses shall not be taken into account in calculating the Employment Fees. |
| Seller and DPS Sales, as applicable, shall terminate the employment of the Business Employees upon Buyer's written request. Seller and DPS Sales, as applicable, will be solely responsible (and shall not be reimbursed by Buyer) for any severance or other expenses related to the termination of employment of any of the Business Employees and any amounts due with respect to services performed for Seller or DPS Sales unrelated to this Agreement or after the Transition Period. | During the Transition Period | |
| Seller and DPS Sales shall continue to process payroll with respect to the Business Employees, including processing all | During the Transition | |

| Service Provided | Time Period[1] | Service Fee Amount |
|---|---|---|
| payroll and related taxes and filings. | Period | |
| Seller and DPS Sales shall continue to maintain and administer for the benefit of the Business Employees and their applicable dependents all existing benefit plans in which the Business Employees participate (as specifically identified on Annex A-1 hereto) and shall continue to process all benefit claims in the same manner as prior to the closing of the transactions under the Purchase Agreement. | During the Transition Period | |
| **Facility-Related Services** | | |
| Seller to continue all third-party services relating to the facility subject to the Lease Agreement, unless otherwise directed by Buyer in writing.<br><br>These services include (but are not limited to) landscaping, snow removal, security and janitorial services. | Until expiration or termination of the Lease Agreement. | Buyer will reimburse Seller for direct and reasonable out-of-pocket costs incurred by Seller for such third-party services plus a 2% administrative fee on such cost.<br><br>Seller shall inform Buyer promptly if any such costs increase (or are expected to increase) relative to the amounts paid by Seller in the previous twelve (12) months. |
| Seller shall continue all utilities relating to the facility subject to the Lease Agreement, unless otherwise directed by Buyer in writing.<br><br>These services include (but are not limited to) telephone, internet, water and electrical. | Until expiration or termination of the Lease Agreement. | Buyer will reimburse Seller for direct and reasonable out-of-pocket utility costs incurred by Seller to the extent arising from utilities used in Buyer's operations plus a 2% administrative fee on such cost.<br><br>Seller shall inform Buyer promptly if any such costs increase (or are |

A-4

| Service Provided | Time Period[1] | Service Fee Amount |
| --- | --- | --- |
| | | expected to increase) relative to the amounts paid by Seller in the previous twelve (12) months |
| Seller shall continue to provide all office services relating to the Business, unless otherwise directed by Buyer in writing. These services include (but are not limited to) making copiers, printers and office supplies available to Buyer and providing for standard shipping services. | Until expiration or termination of the Lease Agreement. | Buyer will reimburse Seller for direct and reasonable out-of-pocket costs incurred by Seller for any such services relating to Buyer's operations plus a 2% administrative fee on such cost. Seller shall inform Buyer promptly if any such costs increase (or are expected to increase) relative to the amounts paid by Seller in the previous twelve (12) months |
| **Insurance-Related Services** | | |
| Each of Seller and DPS Sales shall maintain the insurance policies and coverages set forth on Schedule C attached hereto, or substitute policies providing coverages no less than those set forth on said Schedule C. Buyer shall have the right to terminate Seller's or DPS Sales' obligation to maintain any such policies and coverages and Buyer's obligation to pay a Service Fee in respect thereof. | During the Transition Period | Buyer will reimburse Seller and DPS Sales, as applicable, for direct and reasonable out-of-pocket costs incurred by Seller or DPS Sales, as applicable, for any such services (including the amount of any premiums or deductibles incurred in connection with a claim made at Buyer's direction but excluding any claims for which Buyer is entitled to indemnification pursuant to Section 5.1) relating to Buyer's operations plus a 2% administrative fee on such cost. |

A-5

| Service Provided | Time Period[1] | Service Fee Amount |
|---|---|---|
| | | In the event any such costs relate to a period before or after the Transition Period, Buyer's obligations therefor shall be prorated. |

A-6

## ANNEX A-1

## BENEFIT PLANS

1. Douglas Stephen Plastics, Inc. 401(k) Plan

2. Horizon BCBS New Jersey Direct Access Gold Medical Plan

3. Horizon BCBS New Jersey OMNIA Bronze HSA Medical Plan

4. Guardian Dental Insurance Plan

5. Guardian Vision Insurance

6. Guardian Accident Insurance

7. Group Life Insurance with Principal Financial Group

8. Clarity Benefit HRA account

## SCHEDULE B

## SERVICE COORDINATORS

**Service Providers:**

Douglas Graff
299 Wiermus Road
Woodcliff Lake, NJ 07677
Email: Douggraff9194@yahoo.com
Telephone Number: 201-370-5095

**Service Recipient:**

Joan Rainsford
c/o EasyPak DSP, LLC
24 Jytek Drive
Leominster, MA 01453
Email: jrainsford@easypak.com
Telephone Number: 978-537-5683

## SCHEDULE C

## SELLER INSURANCE

The insurance policies set forth will be effective from the Closing Date through the term of this Agreement:

1. Workers Compensation statutory coverage to include Employers Liability coverage with Bodily injury by Accident $500,000 each accident, Bodily Injury by Disease $500,000 policy limit, Bodily Injury by Disease $500,000 Each Employee. Policy will be endorsed with Alternate Employer Endorsement (including Waiver of Subrogation) naming Buyer and Easypak, LLC. Policy shall be endorsed to provide thirty (30) days' notice of cancellation or non-renewal to Buyer and Easypak, LLC.

2. General Liability coverage with $3,000,000 General Aggregate Limit, $2,000,000 Products/Completed Operations Aggregate Limit, $1,000,000 Each Occurrence Limit, $1,000,000 Personal and Advertising Injury Limit. Buyer and Easypak, LLC will be included as Additional Insureds for Premises Operations and Products Completed Operations with CG2010 and CG2037 or equivalent forms. Coverage will provide Buyer and Easypak, LLC with waiver of subrogation and will be primary coverage and Buyer and Easypak, LLC policies will be non-contributory. Policy shall be endorsed to provide thirty (30) days' notice of cancellation or non-renewal to Buyer and Easypak, LLC.

3. Umbrella coverage with $3,000,000 Aggregate Limit, $3,000,000 Products/Completed Operations Aggregate limit, $3,000,000 Each Occurrence Limit. Coverage will follow the form of underlying General Liability, Auto Liability, and Employers Liability coverage. Buyer and Easypak, LLC will be included as Additional Insureds. Coverage will provide Buyer and Easypak, LLC with waiver of subrogation and will be primary coverage and Buyer and Easypak, LLC policies will be non-contributory. Policy shall be endorsed to provide thirty (30) days' notice of cancellation or non-renewal to Buyer.

4. Property coverage to include Property of Others with limits equivalent to or exceeding the value of property owned by Buyer and Easypak, LLC. Buyer and Easypak, LLC shall be Loss Payee as respects to the property in the care, custody or control of Seller. Policy shall be endorsed to provide thirty (30) days' notice of cancellation or non-renewal to Buyer.

5. Management Liability including Third Party Employment Practices Liability coverage with limits not less than $1,000,000. Policy shall be endorsed to provide thirty (30) days' notice of cancellation or non-renewal to Buyer.

6. Crime coverage for dishonest acts in the amount not less than the value of money or other property owned by Buyer and Easypak, LLC in the care, custody or control of seller. Coverage shall include Buyer and Easypak, LLC as Loss Payee. Policy shall be endorsed to provide thirty (30) days' notice of cancellation or non-renewal to Buyer.